FILED

UNITED STATES DISTRICT COURT 2012 NOV -9  P 4: 06

FOR THE EASTERN DISTRICT OF VIRGINIA
CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *EX REL.* [UNDER SEAL] | Civil Action No:  1:11 CV 1209 TSE/IDD |
| Plaintiff, | FIRST AMENDED COMPLAINT |
| v. | |
| [UNDER SEAL] | |
| Defendants | |

**FILED IN CAMERA AND UNDER SEAL**

**DO NOT ENTER IN PACER**

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *EX REL.* TIMOTHY STINSON | Civil Action No: 1:11 CV 1209 TSE/IDD |
| Plaintiff, | FIRST AMENDED COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729 *ET SEQ.*, AND DEMAND FOR JURY TRIAL |
| v. | |
| RECON INTERNATIONAL, a Louisiana corporation, RIK LTD, a United Arab Emirates Corporation, RECON GENERAL TRADING, a United Arab Emirates Corporation, DAVID CAIN, AND KENNETH G. TRASCHER | |
| Defendants | |

FILED IN CAMERA AND UNDER SEAL

PURSUANT TO 31 U.S.C. § 3730(b)(2)

DO NOT ENTER IN PACER

{00045031; 9}

I.    INTRODUCTION ........................................................................................ 2
II.   PARTIES ................................................................................................... 7
III.  JURISDICTION AND VENUE ..................................................................... 9
IV.   CONTRACT AND REGULATORY BACKGROUND .................................... 10
   A.   The Gravel Contract and RCC Contracts ........................................... 12
   B.   LOGCAP IV Contracts .................................................................... 15
   C.   RECON was Required to Comply with the Anti-Kickback Act ............ 21
   D.   Safety and Security Regulations in Afghanistan ................................. 22
   E.   Prohibitions on Retaliation for Protected Activity .............................. 24
V.    DEFENDANTS DEFRAUDED THE GOVERNMENT BY FALSELY CLAIMING
PAYMENT FOR THOUSANDS OF CUBIC METERS OF GRAVEL THAT WERE
NEVER DELIVERED AND BY MISREPRESENTING THE TYPE OF GRAVEL
PROVIDED ........................................................................................................ 24
VI.   DEFENDANTS KNOWINGLY PURCHASED GOODS ORIGINATING IN
IRAN FOR USE ON GOVERNMENT CONTRACTS AND CONCEALED THAT
INFORMATION FROM THE GOVERNMENT ............................................. 33
VII.  DEFENDANTS VIOLATED SECURITY REGULATIONS BY
CONTRACTING WITH VENDORS ON THE TERRORIST WATCH LIST BANNED
FROM MILITARY BASES AND PROHIBITED FROM GOVERNMENT
CONTRACTING ................................................................................................. 36
VIII. DEFENDANTS CAUSED FLUOR TO SUBMIT FALSE CLAIMS FOR
PAYMENT TO THE GOVERNMENT .............................................................. 44
   A.   Defendants Used On Multiple Contracts Equipment And Labor Exclusively
   Designated for One Contract And Falsely Certified That Such Labor and Equipment
   Was Available For Exclusive Use 24 Hours A Day, 7 Days A Week .......................... 47
   B.   Defendants Instructed Employees to Falsify Timesheets and Submitted For
   Approval and Payment Fraudulent Records For Labor ............................................. 58
   C.   To Verify Costs, Defendants Knowingly Submitted to Fluor Invoices and Other
   Documents That Were Inaccurate and Included Inflated, Duplicative and/or
   Unnecessary Spending ........................................................................................ 75
IX.   DEFENDANTS PARTICIPATED IN A BID-RIGGING SCHEME WITH A
GOVERNMENT CONTRACTING OFFICER DESIGNED TO FRAUDULENTLY
INDUCE CONTRACTS WITH THE GOVERNMENT .................................... 85
X.    DEFENDANTS VIOLATED MINIMUM LABOR STANDARDS INTENDED TO
PREVENT FORCED LABOR .......................................................................... 86
XI.   DEFENDANTS VIOLATED THE ANTI-KICKBACK ACT BY ALLOWING
OFFICERS TO SOLICIT AND RECEIVE PAYMENT FROM LOCAL VENDORS IN
ORDER TO AWARD SUBCONTRACTS ......................................................... 91
XII.  DEFENDANTS UNLAWFULLY RETALIATED AGAINST RELATOR ......... 94
XIII. STATEMENT OF CLAIMS ...................................................................... 105
XIV.  PRAYER ................................................................................................ 109
XV.   DEMAND FOR JURY TRIAL ................................................................ 110

*Qui Tam* Plaintiff Timothy Stinson, through his attorneys, on behalf of the United States of America, for his Complaint against defendant RECON International, Inc., its corporate counterparts RIK LTD and RECON General Trading ("RECON"), and their owners David Cain and Kenneth G. Trascher (collectively, "Defendants") alleges, based upon personal knowledge and relevant documents, as follows:

## I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements and claims made, used, presented, and caused to be made, used or presented by Defendants and/or their agents, employees and co-conspirators, in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. ("the FCA").

2.    Defendants' conduct described herein violates the FCA. The FCA was originally enacted during the Civil War and was substantially amended in 1986. Congress amended the statute to enhance the federal government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive, and that the statute, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the United States to disclose that information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

3.      The FCA prohibits knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). Additionally, the FCA prohibits knowingly making, using, or causing to be made or used, a false or fraudulent record or statement material to a false claim. 31 U.S.C. § 3729(a)(1)(B). Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(1).

4.      For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). The FCA does not require proof that the defendants specifically intended to commit fraud. *Id.* Unless otherwise indicated, whenever the words "know," "learn," "discover," or similar words indicating knowledge are used in this Complaint, they mean knowledge as defined in the FCA.

5.      The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery. Such persons are referred to as "qui tam plaintiffs" or "relators." The complaint must be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the United States Government (hereafter "Government") time to conduct its own investigation and to determine whether to join the suit. Based on these provisions, *qui tam* plaintiff and relator Timothy Stinson (hereafter "Relator") seeks to recover all available damages, civil penalties, and other relief for the violations alleged herein.

6. As described in more detail below, Defendants entered into a contract with the Government to provide gravel necessary for the construction of Camp Leatherneck, a military camp operated by the United States Marine Corps, and other forward operating bases ("FOBs") in southern Afghanistan. The contract provided that the United States would pay Defendants a firm fixed price based on the quantity of gravel that was delivered. RECON would certify and submit daily forms with records of their deliveries to the Government for approval. After completion of an order, RECON would submit the invoice for payment based on the total quantity of material delivered. During the course of performance of the contract, Defendants routinely and knowingly inflated the amount of gravel they reported delivered to Camp Leatherneck and thereby caused the Government to pay for material (gravel) it never received. In addition, Defendants knowingly tendered types of gravel that they knew did not meet the specifications of the contract.

7. Defendants violated the FCA by knowingly submitting for approval to the United States transportation forms with falsely inflated quantities of gravel and false descriptions of the type of gravel that they knew were not in fact supplied and submitting invoices for payment based on those inflated quantities and false product descriptions. Defendants falsely certified to the Government the accuracy of their records while in fact they were continually and systematically including types and amounts of gravel that they knew were never delivered or did not conform to the requirements of the contract. Through this process, Defendants charged the Government for tens of thousands of cubic meters of gravel that were never provided and were not of the type specified.

8.      In addition to the gravel contract, during the period of 2008-2011, Defendants entered into numerous other direct contracts with the Government for construction and materials, including contracts to build Pre-Engineered Buildings at Camp Leatherneck in Helmand Provence, Afghanistan, in connection with which they violated the FCA in four ways. First, despite an express Government prohibition against using material imported from Iran, Defendants knowingly and routinely purchased goods originating in Iran for use on Government contracts in order to keep its costs low. Second, defying express prohibitions against contracting with an identified security risk, Defendants knowingly contracted with a vendor on the "Terrorist Watch List" and continued its business dealings with that vendor in order to avoid increasing payments to subcontractors. Third, Defendants knowingly demanded kickbacks from local Afghan vendors in exchange for awarding subcontracts to supply materials under their Government contracts. Fourth, Defendants participated in a bid-rigging scheme with a military contracting officer designed to maximize profit by using insider knowledge of competitors' bids.

9.      Through these fraudulent schemes and practices, Defendants have illegally sought and obtained payment under numerous construction and materials contracts with the Government, knowing the Government would not have entered into such contracts or made such payments if it knew the true state of affairs.

10.     In addition to direct contracts, between at least 2008 and 2010, Defendants also violated the FCA in connection with work they did on the LOGCAP IV contract as a subcontractor of Fluor Intercontinental, Inc. ("Fluor") in three ways. With each of these practices, Defendants submitted to Fluor fraudulent documents or made false statements

to Fluor in order to obtain payment from Fluor, whose costs Defendants knew were being reimbursed by the Government. With each of these three practices, RECON knowingly caused Fluor to submit false claims for payment to the Government.

11. First, in connection with a contract for loading and unloading military flights, Defendants failed to provide equipment and staff that was dedicated exclusively to this contract and instead used this equipment and staff on multiple government contracts, thereby causing the U.S. Government, through reimbursing Fluor, to pay for the same equipment multiple times, and pay for services that were not fully rendered.

12. Second, Defendants engaged in a systematic practice of timekeeping fraud, whereby they falsified information regarding the amount of time employees worked on various LOGCAP IV subcontracts and the projects on which employees worked and submitted these falsified and artificial time sheets and records to Fluor for payment.

13. Third, after agreeing to finalize price terms in various LOGCAP IV contracts based on provable costs or records, Defendants submitted false invoices and receipts to Fluor as proof of costs that they could not verify accurately correlated to projects completed. By creating and maintaining faulty records, Defendants routinely billed Fluor for work whose costs Defendants knew could not be verified and for materials (such as excess steel) that Defendants knew were not used on or needed under the contract.

14. Finally, in connection with its performance of both direct Government contracts and LOGCAP IV subcontracts, Defendants also withheld workers' passports and failed to maintain basic safety standards for its workers, in order to keep its labor costs low, in direct violation of legal and contractual obligations.

15.     Through these various fraudulent schemes, Defendants have illegally sought

payment from the Government (both directly in the case of direct contracts and indirectly

through the prime contractor in the case of the LOGCAP IV contracts) for costs that were

not verified or properly vetted.  Furthermore, it billed Fluor and the Government for

contracts that it specifically knew would never have been approved for payment, thereby

fraudulently causing the Government to pay claims.

16.     In addition to the FCA violations, Relator seeks in this action to recover damages

resulting from RECON's retaliation against him for lawful acts he took to stop or in

furtherance of other efforts to stop one or more violations of the False Claims Act.

**II.     <u>PARTIES</u>**

17.     The United States (or "Government"), the real party in interest herein, entered

into contract number W91B4L-09-D-0029 with RECON International to purchase gravel

on January 23, 2009 ("the Gravel Contract").  The Regional Contracting Center ("RCC")

located at the Kandahar Air Base in Afghanistan, solicited and administered the Gravel

Contract.  The RCC reported to the Joint Contracting Command-Iraq/Afghanistan ("JCC-

I/A"), which was located in Baghdad, Iraq.  JCC-I/A was under the responsibility of the

Deputy Assistant Secretary of the Army for Policy and Procurement in the Pentagon in

Arlington, Virginia. The United States has also entered into numerous additional

contracts with RECON since 2009, including, inter alia, contracts for the provision of

prefabricated and portable buildings, insulation, and construction of various camp

facilities.

18.     Timothy Stinson is the *Qui Tam* Plaintiff/Relator in this action (hereafter, "Relator") and is a resident of Curtis Bay, Maryland.  From February 2010 through December 2010, Relator was a resident of Marshall, Virginia.  Relator began working for RECON International, Inc. ("RECON International" or "RECON") in 2006.  He worked at RECON for several months as an independent contractor, and returned in 2008 as an employee.  Throughout 2008 and 2009, Relator directed security operations for RECON, in the position of 2IC, or Second in Command, to the Manager at Camp Bastion, and later Deputy Country Manager, and served as an informal labor representative for RECON's staff of foreign and domestic workers.  While working for RECON, Relator earned a position of trust among the staff.  It was through this position that staff members regularly consulted with him about concerns regarding the company, and eventually disclosed to him information and documentation about ongoing fraudulent activities, including the gravel fraud, MEB fraud, and kickback violations described herein.  Relator had an employment relationship with RECON until his retaliatory constructive discharge in early October  2010.

19.     Defendant RECON International ("RECON") is a closely held corporation incorporated in Louisiana with a principal place of business in Dubai, UAE.  It also has offices at Camp Bastion, Afghanistan.  Camp Bastion is adjacent to Camp Leatherneck, a United States Marine Corps camp located in Helmand Province in Southern Afghanistan.  RECON International began its operations in 2003, and since then it has participated in numerous contracts for the Government, including the Gravel Contract, various construction and materials contracts, and the LOGCAP IV contract referenced herein.

20.     Defendants RIK LTD (RIK) and RECON General Trading are corporate counterparts to RECON International, with offices in Dubai, UAE.  RIK is owned by Kenneth Trascher and David Cain, and is believed to be the UAE headquarters of RECON's operations. RECON General Trading is also believed to be owned by Trascher and Cain, in addition to RECON Head Engineer, Richard Thompson. RECON General Trading is engaged in sales of construction materials acquired through its contracting operations. The exact corporate structure of these companies is unknown, although Cain and Trascher exercise complete control over all the corporate entities.

21.     Defendant David Cain is a founder and co-owner of RECON International.  Mr. Cain currently resides in the UAE, and is believed to have a United States residence in Cleveland, Ohio. Cain, along with Defendant Kenneth Trascher, exercises complete control over the operations of RECON, RIK, and RECON General Trading.

22.     Defendant Kenneth Trascher is a founder and co-owner of RECON International. As described above, along with Defendant David Cain, Trascher exercises control over the operations of RECON and RECON subsidiaries. He currently resides in the UAE, and is believed to have a United States residence in Madisonville, Louisiana.

23.     Defendants will be referred to collectively in this Complaint as "RECON International," "RECON," or "Defendants."

## III.     <u>JURISDICTION AND VENUE</u>

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Under 31

U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

25.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States.

26.     Venue is proper in the Eastern District of Virginia pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found in and transact or have transacted business in this district. Additionally, although much of the conduct at issue in this case occurred in Afghanistan, the Gravel Contract falls under the authority of the Deputy Assistant Secretary of the Army for Policy and Procurement, located in the Pentagon in Arlington, Virginia, and the LOGCAP IV contract was also administered in part from the Pentagon. In addition, statutory violations, as alleged herein, occurred in this judicial district.

## IV.    CONTRACT AND REGULATORY BACKGROUND

27.     Contingency contracting is a general term used to refer to Government contracts that provide support to United States military and humanitarian operations not readily available through organic logistics capabilities. These ad hoc contracts are essential to provide on-the-ground responsiveness to military needs in the course of international operations, such as the current United States military operations in Afghanistan and Iraq.

28.     The Joint Contracting Command–Iraq/Afghanistan (JCC-I/A) was created in 2005 to coordinate contingency contracting in Iraq and Afghanistan. JCC-I/A was headquartered in Baghdad, Iraq. Since 2010, JCC-I/A responsibilities have been transferred to the Joint Theater Support Contracting Command headquartered in Qatar.

29.     JCC-I/A contracts fell under the authority of the Deputy Assistant Secretary of the

Army for Policy and Procurement. The Secretary's office is located in the Pentagon in

Arlington, Virginia.

30.     Responsibilities in the regions of Iraq and Afghanistan were administered through

separate Principal Assistants Responsible for Contracting (PARC). The PARC for

Afghanistan Operations oversaw the contracting procedures of Regional Contracting

Centers (RCC) in different locations throughout the country. Contracting officers in each

RCC were responsible for soliciting contracts in their individual regions to provide

on-the-ground support for the local military needs. These regional offices arranged for

essential contracts for materials and services not otherwise provided through existing

Government contracts, such as the task orders under the Logistics Civil Augmentation

Program (LOGCAP) IV.

31.     The RCC in Kandahar, Afghanistan administered contracts in the south western

region of the country, including Helmand Province where Camp Leatherneck is located.

An RCC office was later opened in Camp Leatherneck itself.

32.     In 2008, the Government planned to expand operations in southern Afghanistan

and increase its troop deployment in the region. The United States military intended to

station several thousand additional soldiers in Helmand Province and surrounding areas.

To enable this deployment, the Government planned to construct and expand operating

bases in the region, including Camp Leatherneck (formerly known as FOB Tombstone).

This expansion generated the need for construction materials and contractors.

33.     RECON had an office at Camp Bastion, a British camp, in Helmand Province in 2008. It had been working with the International Security Assistance Force (ISAF) to provide material support to British troops in the region. As a result of this work, Defendants had existing contacts in the region and were ideally situated to respond to solicitations for construction materials when the United States military sought to create its own bases in Helmand Province in 2008.

### A. The Gravel Contract and RCC Contracts

34.     Kandahar Regional Contracting Center issued a request for bids in November 2008 for a contractor to provide gravel for the Regional Command (RC) South in Afghanistan. It received only one bid, from RECON International. In January 2009, the Kandahar Regional Contracting Center awarded RECON contract number W91B4L-09-D-0029 ("the Gravel Contract") to supply an indefinite quantity of gravel to the Government for the continued expansion of Camp Leatherneck and additional Forward Operating Bases (FOB) in the southern region of Afghanistan. A copy of the Gravel Contract is attached hereto as Exhibit 1 and incorporated herein.

35.     Under the terms of the contract, the Government would periodically place Delivery Orders for gravel to be delivered to bases in the RC South region. RECON International was required to procure and deliver the requested type and quantity of gravel to the delivery location.

36.     The terms of the contract indicated the material would be provided for a "Firm Fixed Price" based on negotiations for each delivery order. Because the Government received only one bid, it was not able to institute competitive pricing for Delivery Orders,

{00045031; 9}

as intended in its original solicitation. Accordingly, the price was set by RECON International. In its first Delivery Order, the Government agreed to pay RECON $24.50-$26.50 per cubic meter of gravel delivered to Camp Leatherneck (then still named FOB Tombstone). A copy of this Delivery Order is attached hereto as Exhibit 2 and incorporated herein. It paid comparable amounts in subsequent orders.

37.     In accepting each delivery order, issued on Standard Form 1449, RECON had to certify that it agreed to "furnish and deliver all items set forth or otherwise identified." See Exhibit 2. Through performance under the Gravel Contract, Defendants explicitly promised (as described below) to deliver the quantity and types of materials requested.

38.     The Gravel Contract was governed by the Federal Acquisition Regulations ("FAR"), codified in Chapter 48 of the Code of Federal Regulations. It incorporated by reference the Contract Terms and Conditions for Commercial Items. 48 C.F.R. § 52.212-4. This regulation provides that the Contractor "shall only tender for acceptance those items that conform to the requirements of the contract." Thus, by executing the Gravel Contract, Defendants agreed that all items they delivered under the Contract would conform with the types and quantities of materials requested in each Delivery Order.

39.     Defendants would tender gravel to the Government through its delivery to the requested location, which usually was Camp Leatherneck. At regular intervals, RECON officials would submit to the Government daily totals of the amount and type of gravel delivered under the contract. These records were kept on daily forms. Every form had to be signed by a United States military official, typically the Chief Storekeeper (SKC).

RECON management also approved the records. In this way, RECON could keep track of and report to the Government progress under a Delivery Order.

40.     Upon completion of a Delivery Order, Defendants would send a completed invoice to Major Nathan N. Winn at the Regional Contracting Center at Camp Leatherneck. Invoices were required to include a description of the items delivered (e.g., gravel), including the quantity, which had to correspond to the Delivery Order. A copy of Delivery Order 008 with invoicing instructions is attached as Exhibit 3 and incorporated herein.

41.     Thus, pursuant to the Gravel Contract provisions, each invoice submitted to the Government certified that RECON had delivered the gravel described in the Delivery Order. In addition, each daily Transport Form signed by Defendants certified to the Government that the quantity and type of materials listed was accurate. Thus, Defendants made numerous certifications that the quantity and quality of gravel listed equaled the amount of gravel tendered at Camp Leatherneck and the other FOBs.

42.     RECON also entered into numerous additional Government contracts issued by the RCC. From 2009 through 2011, the Government awarded at least 59 contracts to RIK, a corporate counterpart of RECON International. A copy of the Government spending records listing many of these contracts is attached hereto as Exhibit 4 and incorporated herein. Of the 59 contracts listed, 27 were for prefabricated and portable building materials, worth $7,962,418. On information and belief, these public records are not exhaustive.

- 14 -
1st AM. COMPLAINT

## B. LOGCAP IV Contracts

43.     The Logistics Civil Augmentation Program, or "LOGCAP," was established in 1985 to enable and coordinate civilian contractor logistical support for U.S. military forces deployed overseas, principally in countries with which the U.S. does not have treaties or agreements that would enable the host country to provide such services. Initiated in 1985, the program has grown exponentially in the last ten years as the Government has relied increasingly on private contractors to support United States military missions in Afghanistan and elsewhere.

44.     LOGCAP IV, the fourth LOGCAP contract since the inception of the program, was awarded through a competitive process administered by the Army. In June 2007, the Army Sustainment Command (ASC) selected three companies to serve as performance contractors—DynCorp International LLC, headquartered in Fort Worth, Texas; KBR, in Houston, Texas; and Fluor Intercontinental, Inc. ("Fluor"), in Greenville, South Carolina (Contract no. W52P1J-07-D-0008).

45.     The LOGCAP IV contract was awarded as an Indefinite Delivery/Indefinite Quantity contract (ID/IQ) with one base year followed by nine option years.

46.     The LOGCAP IV contract covers a range of services including supply operations (food, water, fuel, spare parts); field operations (food, laundry, housing, sanitation, waste management, postal services, and morale, welfare and recreation activities); and other operations (engineering and construction; support to the communication networks; transportation and cargo services; and facilities and repair).

47.     Because it is impossible to specify the military's precise needs at the outset of

each LOGCAP prime contract, as military needs arise, the Government and prime

contractors execute Task Orders detailing particular operations or services that a

contractor must furnish.

48.     Fluor Intercontinental, Inc. ("Fluor") was awarded Task Orders 2 and 4 to support

the Military's operations in Afghanistan in 2008.  It was paid on a cost-plus basis,

whereby Fluor would be reimbursed by the Government for costs it incurred under the

contract and would receive a bonus fee based on its performance under the contract.

49.     Fluor signed a Blanket Ordering Agreement (BOA) with RECON (Contract No.

FIIBOA-K9-0096) in 2008 in order to establish RECON as a subcontractor to assist Fluor

in its performance of the LOGCAP IV contract.  A copy of the BOA and subsequent

revisions are attached hereto as Exhibit 5 and incorporated herein. Fluor engaged

RECON in significant operations from 2008 through 2010 to assist on the LOGCAP IV

Task Orders in Afghanistan.

50.     Under the LOGCAP IV contract and through the BOA, subcontractors (including

RECON) agreed to comply with the Federal Acquisition Regulation (FAR), as well as the

Defense supplement to the FAR (DFAR).  In addition, under its BOA with Fluor,

RECON was required to comply with a wider range of terms, provisions, and

representations set out in Army regulations, Fluor documents, and other sources.

51.     Per the BOA, Fluor would issue Task Order Releases (TOR) to RECON

describing the scope of work and method of payment for individual tasks.  Each TOR

was amended with numerous modifications, through which Fluor and RECON would clarify specific projects and operations required in the region as the need arose.

52.     Fluor awarded RECON four Task Order Releases (TOR) from 2008 to 2009. TOR 001, issued on September 27, 2008, involved the construction, operation and maintenance of four Forward Operating Bases (FOBs) at four locations in Afghanistan. A copy of TOR 001 is attached hereto as Exhibit 6 and incorporated herein. TOR 002, issued on November 1, 2008, dealt with the operations and maintenance of the same four FOBs in Afghanistan. A copy of TOR 002 is attached hereto as Exhibit 7 and incorporated herein. TOR 003, issued on December 19, 2008, required the construction of eight FOBs in eight separate locations in Afghanistan. A copy of TOR 003 is attached hereto as Exhibit 8 and incorporated herein. TOR 004, issued on January 30, 2009, involved the provision of labor support services to those eight forward operating bases. A copy of TOR 004 is attached hereto as Exhibit 9 and incorporated herein.

53.     TORs were multi-priced contractual vehicles, which could be any combination of Time and Materials, Cost-Reimbursement, Labor-Hour, and Firm-Fixed Price payment structures. These contracts would be priced through the issuance of contract modifications. Modifications would describe a narrow scope of work and include the price terms.

54.     In order to price a specific project, Fluor would issue a Request for Proposal or Scope of Work under a particular Task Order Release. These requests would include a pricing schedule where RECON could list its price breakdown for a project. In order to ensure a fair and reasonable price, in accordance with its obligations to the Government,

Fluor would request, from time to time, the submission of "complete and detailed price proposals." These were required to describe the plan for completion of the contract.

55.     RECON, through the BOA, was aware of Fluor's obligations to the Government to provide pricing data and submit fair and reasonable costs. In addition, RECON explicitly agreed to "support Company [Fluor] as required to meet Client's [Government] requirements including but not limited to: audit support, cost verification, and cost breakdowns." See Exhibit 5, Part II, 2.5.

56.     According to the BOA, RECON was responsible for maintaining adequate documentation to verify costs and units. In addition, RECON agreed to maintain records for two years relating to all contracts paid on a reimbursable basis or unit price and allow Fluor to audit, copy, and inspect those records. See Exhibit 5, Part III, Versions 1 and 2, 24.0, 40.3.

57.     Under the terms of the TORs, a price could be set or "definitized" after the contract had been issued. Fluor could issue "Not to Exceed" contracts and/or "Letters of Technical Direction," whereby Fluor would request RECON begin working on a specific project prior to establishing a firm price. At a later date, RECON and Fluor would negotiate terms to finalize the price. Generally, RECON was required to present supporting materials, such as receipts, time sheets and other records, to support the costs expended and negotiate a final figure. Both TOR 001 and TOR 003 established base funding on a "Not to Exceed" basis, with the understanding the price would be definitized at a later date. See Exhibits 6 and 8.

58.     Some of the final modifications under Task Order Releases 001 and 003 were
Fixed Price contracts, where Fluor and RECON negotiated a fixed rate to perform a
distinct amount of work.  Under Task Order Releases 002 and 004, the contract generally
used Labor-Hour pricing.  However, the contracts also included Time-and-Material and
Cost Reimbursements contracts, where Fluor, with Government funds, would reimburse
RECON for labor and/or costs.

59.     Under the BOA, RECON was required to "maintain time and labor distribution
records for all employees who work under the Contract by Task Order Release.  These
records must document the time worked and work performed by each individual for each
Task Order Release.  Copies of time cards to be submitted with invoice."  Exhibit 5, Part
II, 1.5.  Each Task Order Release and subsequent modification had specific requirements
for the maintenance of accurate time sheets or records.

60.     Task Order Releases 002 and 004 both involved the provision of operations and
management staff to support the efforts of Forward Operating Bases in Afghanistan.
Under these contracts, RECON was paid an "all inclusive labor rate" negotiated between
Fluor and RECON.  Under this fixed unit rate, each labor hour would have a dollar
amount affixed to it based on the type of work provided.  A copy of the TOR 002
Proposal Cover Letter and Pricing Sheet is attached hereto as Exhibit 10 and incorporated
herein.

61.     Invoicing and payment for Labor-Hour Task Order Releases were governed by
FAR 52.232-7 "Payments under Time-and-Materials and Labor-Hour Contracts."
Exhibit 5, Part II, 7.1; 48 C.F.R. § 52.232-7.  Specifically, FAR 52.232-7 provides that

the amount to be paid "shall be computed by multiplying the appropriate hourly rates prescribed in the Schedule by the number of direct labor hours performed." As such, proper payment was contingent on accurate reporting of time worked.

62.     Under the BOA, "Contractor [RECON] was only to be reimbursed for the hours for which their employees [were] paid." See Exhibit 5, Part II, 2.9.

63.     Because payment for Labor-Hour contracts was contingent on the hours worked and paid, RECON was required to keep time sheets that tracked the workers' names, classification, and labor hours.  Time sheets were required to document the time worked and work performed by each individual for each Task Order Release. Exhibit 5, Part II, 1.5. Time was subject to audit to ensure that Fluor was billed properly for "actual hours worked and paid to its [RECON's] employees." Exhibit 5, Part II, 1.3.

64.     Under the BOA, invoices were required to include a Progress Payment Release, which certified that the Contractor had paid in full for all labor or materials furnished, all equipment used, and all sub-contracts employed.  The contractor was also required to indicate the number of hours worked (for Labor-Hour contracts), and provide copies of timesheets signed by the workers to certify the accuracy of that time.  Government payment for labor hours was conditioned on the submission of timesheets and proper recording of time.  With each invoice, RECON was required to certify that the work covered by the invoice was complete and that the invoice was correct and authentic. Exhibit 5, Part II, 7.1, 7.11.

65.     Upon receipt of the invoice, Fluor would review the invoice and process it for payment.  If there was sufficient supporting documentation, Fluor would pay RECON for

the work, according to the invoice. Fluor would then seek repayment for the amounts

expended under the RECON subcontract according to the terms of its cost-reimbursement

prime contract with the Government.

66.     Under TOR 001 and 003, RECON also was required to keep time sheets to

support the costs for certain projects, including undefinitized items. Time sheets or head

counts, tracking time worked on particular projects, were essential for audits of

manpower used on these Task Orders to ensure Fluor and the Government received full

performance. As described *supra* ¶ 56, RECON was required to keep these records for all

contracts paid on a reimbursable or unit basis.

### C. RECON was Required to Comply with the Anti-Kickback Act

67.     The Anti-Kickback Act of 1986 prohibits accepting or furnishing kickbacks for

the purposes of influencing government contracting. 41 U.S.C. §§ 8701-8707. Congress

enacted the Anti-Kickback Act of 1986 to broaden coverage in the Anti-Kickback Act in

order to deter kickbacks relating to subcontracts under Federal Government Contracts.

Specifically, Congress was concerned with kickbacks used in the defense industry.

68.     The Act provides:

> It is prohibited for any person -
> (1) to provide, attempt to provide, or offer to provide any kickback;
> (2) to solicit, accept, or attempt to accept any kickback; or
> (3) to include, directly or indirectly, the amount of any
> kickback prohibited by clause (1) or (2) in the contract price
> charged by a subcontractor to a prime contractor or a higher tier
> subcontractor or in the contract price charged by a prime
> contractor to the United States.

69.     FAR 52.203-7 incorporates the prohibitions of the Anti-Kickback Act into

government contracts. 48 C.F.R. § 52.203-7. FAR 52.203-7 must be included in all

government contracts, other than those for commercial items, that exceed $100,000. Therefore, any contracts RECON held directly with the Government, other than for commercial items, was required to include that term. Additionally, Part IV of the BOA included by reference FAR 52.203-7, applicable to all subcontracts exceeding $100, 000.

### D. Safety and Security Regulations in Afghanistan

70.     As a government contractor, RECON was required to adhere to various security directives designed to maintain a safe environment for the United States Military ("Military") and the numerous American and foreign nationals employed in Afghanistan. Given the highly dangerous nature of work on the front lines of battle, adherence to security regulations is of critical importance to the military operations in Afghanistan.

71.     According to the terms of its contract with Fluor, RECON was required to "comply strictly with all local, municipal, state, federal and governmental laws, orders, codes and regulations applicable to Contractor's operations in the performance of the Work" under its contract. Exhibit 5, Part III, 22.1. As such, all activities known to be illegal or contrary to military regulations were clearly prohibited under the terms of the Fluor subcontract.

72.     All contractors and subcontractors had to follow security directives issued by the Military. Part IV of the Blanket Operating Agreement incorporated the full text of DFARS 252.225-7043, "Antiterrorism/Force Protection For Defense Contractors Outside the United States," which requires that the contractor "obtain and comply with the most current antiterrorism/force protection guidance for the Contractor and subcontractor personnel." See Exhibit 5, Part IV.

73.     Contracts between RECON and the Military, including but not limited to the

Gravel Contract, also required strict compliance with the law and security regulations.

"The Contractor shall comply with all applicable Federal, State and local laws, executive

orders, rules and regulations applicable to its performance under this contract." 48 C.F.R.

§ 52.212-4.  If the Military prohibited business operation with certain types of vendors,

or restricted the presence of persons or technology on military camps, RECON was

required to comply with these directives.

74.     Various United States laws and Executive Orders prohibit business with Iran. 31

C.F.R. § 560.206; Exec. Order No. 12,957, 60 Fed. Reg. 14,615 (March 17, 1995).

75.     Section IV of the BOA between RECON and Fluor was amended in July 2009 to

include Section 52.225-13, "Restrictions on Certain Foreign Purchases."  According to

FAR 52.225-13, contracts issued by the Government must include the following

provision:

> (a) Except as authorized by the Office of Foreign Assets Control [OFAC].
> . . in the Department of the Treasury, the Contractor shall not acquire, for
> use in the performance of this contract, any supplies or services if any
> proclamation, Executive order, or statute administered by OFAC, or if
> OFAC's implementing regulations . . . would prohibit such a transaction
> by a person subject to the jurisdiction of the United States.
>
> (b) Except as authorized by OFAC, most transactions involving... Iran
> ...are prohibited.

Exhibit 5, Part IV, Rev. 04; 48 C.F.R. § 52.225-13.

76.     According to OFAC, United States persons are prohibited from engaging in any

transactions, including purchase, sale, transportation, swap, financing, or brokering

transactions related to goods or services of Iranian origin or goods or services owned or controlled by the Government of Iran. 31 CRF § 560.206.

77.     As a Government contractor, RECON was forbidden from acquiring products it knew to have Iranian origins. This coincided with essential national security and anti-terrorism objectives in the region, such as preventing Iran's nuclear development and proliferation.

    **E. Prohibitions on Retaliation for Protected Activity**

78.     Under the federal False Claims Act's anti-retaliation provision, 31 U.S.C. § 3730(h), any employee, contractor, or agent is entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop one or more violations of the False Claims Act. An employee, contractor or agent retaliated against in violation of this section is entitled to reinstatement, double the amount of lost back pay, interest on the back pay, and special damages, including attorney fees and litigation costs. *Id.*

**V.     <u>DEFENDANTS DEFRAUDED THE GOVERNMENT BY FALSELY
CLAIMING PAYMENT FOR THOUSANDS OF CUBIC METERS OF
GRAVEL THAT WERE NEVER DELIVERED AND BY
MISREPRESENTING THE TYPE OF GRAVEL PROVIDED</u>**

79.     RECON began performance under the Gravel Contract in January 2009. RECON collaborated with local Afghan vendor Zobair Quadrat Construction Company ("ZQCC") in order to obtain gravel. Through connections with local Afghan businessmen, ZQCC

was able to find a supplier, the Salam Khan Navin Construction Company ("SNCC"),

willing to mine and deliver the gravel (also known as "river rock" because the primary

source of the gravel came from a nearby river bed) to the camp, at least initially, for a

total of $8.40 per cubic meter. See Exhibit 11, ZQCC Contract with SNCC, attached

hereto and incorporated herein. RECON coordinated the delivery of the gravel from its

subcontractors to the locations specified by the Government.

80.     SNCC hired local Afghans, who provided their own trucks, in order to transport

the gravel. Each truck was assigned a number that it maintained throughout the course of

the contract period. This number, which was posted on a paper affixed to the windshield

of the trucks, facilitated recordkeeping and ensured greater security around the base.

81.     The terms of the Gravel Contract provided for specific quantities of material to be

delivered to the United States military bases, including Camp Leatherneck. RECON

recorded the amount of gravel delivered under the contract, and the supplies were

inspected by the Government at the destination. See Exhibit 1 at 4. Due to technological

and operational limitations in the warzone, truck scales and other exact measurement

devices were not available. In order to manage this limitation, Defendants developed a

method to quantify the amount of gravel that was being delivered.

82.     In order to measure the gravel, prior to allowing the truck operator to make

deliveries, an employee of RECON and its subcontractor (ZQCC and/or SNCC) would

measure the volume of the truck bed in cubic meters. RECON would then record the

truck number along with its corresponding volume. ZQCC and/or SNCC, the Afghan

subcontractors, also recorded each truck's volume to ensure it received proper payment.

83.    After RECON and the Afghan subcontractors had recorded the volume of the truck bed, the truck would depart to the quarry.  At the quarry, it would receive a load of gravel.  The truck would then return to the delivery location (the particular United States military base, including Camp Leatherneck) and deposit its load of gravel.  Typically, individual trucks would make multiple trips each day.

84.    In order to track the total volume that had been delivered to the various United States military bases each day, RECON kept daily "Tombstone River Material Transport Forms" ("Transport Forms").  ("Tombstone" refers to FOB Tombstone, the original name of Camp Leatherneck.)  The Transport Forms had columns for the truck number, type of material, volume of the truck bed, trips taken per day, and total daily volume from the truck.  A copy of the Transport Forms is attached as Exhibit 12, and incorporated herein. A RECON employee and an Afghan subcontractor (typically ZQCC) would observe the trucks as they entered the base to make their delivery and keep a daily tally of the number of trips each truck made.  That number was multiplied by the volume of the particular truck bed in order to obtain a daily volumetric total for that truck, recorded in the last column.  The daily total from each truck was added together to obtain a total for all the day's deliveries, which was recorded at the bottom of the form.

85.    For purposes of the Gravel Contract, RECON had to report the volume it received and delivered to two parties – (1) the Afghan subcontractors (in order to pay them) and (2) the Government (in order to get paid for the delivery).  RECON had to pay the subcontractors based on the quantity of gravel the subcontractors provided.

86.     At or around December 2008, RECON's Country Manager in Afghanistan,

Joseph ("Joey") Tagliabue, called RECON's Head of Operations at Camp Bastion, his

brother David Tagliabue, and directed him to begin adding cubic meters to the volume of

the truck beds at Camp Leatherneck on the Transport Forms that RECON sent to the

Government for payment.  Immediately after hanging up the phone with Joey Tagliabue,

David relayed these instructions to RECON Operations Coordinator, Matt Aitchison, who

was in charge of overseeing the Gravel Contract.  Relator was present during the

conversation between David Tagliabue and Matt Aitchison when David Tagliabue told

Aitchison to start adding one meter to the volume of each truck bed for each delivery,

which took place in the administrative offices at Camp Bastion, and Relator also

overheard the telephone conversation between David Tagliabue and Joey Tagliabue

directly preceding it.

87.     Shortly thereafter, RECON began to keep two sets of records for all gravel

delivered to Camp Leatherneck – one to track the inflated volume of gravel reported to

the Government ("Government Records") in order to get paid, and one that tracked the

actual volume that corresponded with the Afghan totals ("Afghan Records") in order to

pay the Afghan subcontractors.  In the Government Records, RECON increased the

recorded volume of nearly every truck by one or more cubic meters.  The volume of each

truck, once recorded, was kept constant.  The increase was thus the same every day the

truck continued making deliveries.  This increased volume would be multiplied by the

number of trips made by a truck each day, further exacerbating the fraud.  RECON

incorporated these falsely inflated numbers in every Daily Transport Form, which was later submitted to the Government in support of Defendants' request for payment.

88.     Each day, the fraudulent Transport Form would be approved by the Operations Coordinator or his agent at RECON and accepted by the Military's Chief Storekeeper. RECON knew that the numbers had been inflated and did not reflect the actual quantity of material delivered, but concealed this information from the Government. The Government believed it was receiving gravel in quantities considerably higher than it actually received. It had no way of knowing the volume was actually much lower, because it had no access to the Afghan Records and no contact with the Afghan subcontractors who supplied the gravel to RECON.

89.     Upon stated completion of a Delivery Order based on its inflated numbers, RECON would submit an invoice to the Government's Regional Contracting Center for payment. RECON certified its completion of the Delivery Order through submission of the invoice, when in fact it had not delivered the quantity of goods it asserted but instead had delivered considerably less than the stated amount.

90.     From January through June 2009 the number of trucks in operation delivering gravel to Camp Leatherneck increased from a handful to over two hundred. RECON falsely inflated the volume of the truck bed of nearly every truck delivering gravel to Camp Leatherneck. For example, on June 12, 2009, out of 220 trucks delivering gravel that day, all but 10 had falsely inflated volumes. Typically, the amount of the increase was one cubic meter; however, the amount of the inflation ranged from 0.5 to 4 cubic meters. For instance, Truck 268 had a volume of 17 cubic meters, as reported in the

{00045031; 9}                                    - 28 -

Afghan Records.  However, in the Government Records, the volume of the truck bed was reported as 20 cubic meters.  Between February and June 2009, the typical inflation in the net volume of the truck beds was ten to fifteen percent.

91.     At or around June 2009, RECON employees Zlatan Mijatovic and Zoran Pejovic approached Relator to inform him of the ongoing fraud involving RECON's inflation of the volume of the truck beds carrying gravel to Camp Leatherneck and other FOBs on the Daily Transport Forms and other records submitted to the Government to support payment.  Mijatovic and Pejovic, both Bosnian nationals, were hired by RECON to work on the construction of Camp Leatherneck and other U.S. FOBs in southern Afghanistan. Another RECON employee, Dragan Dragonjic, had trained Mijatovic and Pejovic in the fraudulent recordkeeping practice of inflating the volume of the truck beds on the Daily Transport forms and other Government Records, as he had been instructed to do by Matt Aitchison.  Matt Aitchison had by then left the company.

92.     Mijatovic and Pejovic informed Relator of the specific manner in which Defendants were defrauding the Government.  In addition, they provided Relator with digital copies of the two sets of records: the Afghan Records and the Government Records, from the period of March through June of 2009.  While not comprehensive, the records include most of the details of deliveries and volumes as reported to the Afghan subcontractors and the Government from this time period.  The documents also include copies of Transport Forms with inflated numbers signed by RECON management and Government representatives.  Copies of excerpts of the Afghan Records and Government Records are attached hereto as Exhibits 13 and 14 and are incorporated herein.

93.     Relator informed RECON's owner David Cain of his knowledge of the gravel

fraud in or around June 2009.  Subsequently, Cain dismissed both Messrs. Tagliabue, in

addition to reassigning the Bosnian workers who had been in charge of overseeing the

records, Mijatovic and Pejovic.  Because RECON was paid directly by the Government

for the quantity of gravel provided, none of the individuals terminated would have

benefitted from the alteration in the records.  With regard to the Gravel Contract, only

RECON, which received the payment from the RCC, received any benefit.

94.     Shortly after firing these workers, Cain arranged for two existing RECON

employees—James Haffey and Mike Bradley—to be relocated and assigned to Camp

Leatherneck.  Shortly after starting his RECON work at Camp Leatherneck, Relator

observed Mike Bradley destroying documents from the office of the former Operations

Coordinator, Matt Aitchison.  Relator believes these records corresponded to the inflated

gravel deliveries.

95.     When Relator informed Cain of the gravel fraud in or around June 2009, Cain

assured Relator the Government would be informed of "an error in record-keeping."

However, Cain never informed the Government of the fraudulent activities, nor did

RECON ever issue a rebate of funds or correct the overstated amount of the gravel

through the delivery of additional materials.  RECON's owners David Cain and Kenneth

Trascher continued to conceal from the Government RECON's fraudulent scheme of

overstating the amount of gravel delivered to Camp Leatherneck in order to increase the

amount that RECON was paid.

{00045031; 9}                          - 30 -
                          1st AM. COMPLAINT

96.     Although Cain at one point claimed RECON had conducted an internal audit of

the amount of gravel delivered, Relator does not believe this audit was ever completed.

97.     In addition to misrepresenting the amount of gravel it was providing the

Government, RECON also knowingly misrepresented the type of gravel it was supplying

the Government under the Gravel Contract and provided gravel that did not meet the

Government's specifications.

98.     Because the Government had several different projects at the Military bases that

required varying sizes and grading of gravel, the Government's Delivery Orders called

for gravel in varying sizes. For example, Delivery Order 001 called for "1 1/2" gravel:

Open-Graded – a random mixture of material sized not very well segmented" and "Road

Base—1" minus gravel, not to have round edges: Well-Graded—almost all the rock is

within the same size." Delivery Order 5 called for gravel of 1" minus, 2" minus, and 3"

minus. However, in May 2009, David Tagliabue, RECON's project manager of the

Gravel Contract, informed the Relator that there was no difference in the type of gravel

RECON delivered under the contract.

99.     On May 22, 2009, project manager David Tagliabue received the following

inquiry from the Government's Assistant Supply Officer, Stephen Mannila, about non-

conforming deliveries under the Gravel Contract:

> Are the delivery notes correct on the mm delivered? Are you using 1 ¼"
> minus for the 1 ½" minus? Even if you were, you would have delivered
> 42572 M^3 that wasn't a part of the contract. According to my
> calculations this is where you stand:
> 3" Minus:3780 M^3 remaining
> 2" Minus: 59413 M^3remaining
> 1" Minus: 7950 M^3 remaining

> And that is assuming you used 0-30mm for 1 ½" minus. Please let me
> know of any corrections on the size of gravel delivered for each day of the
> delivery notes. I don't know if Dragan was paying attention when he
> wrote the correct sizes down for each day delivered. Thanks for your
> help.

Exhibit 15, attached hereto and incorporated herein.

100.    While formulating RECON's response to the Assistant Supply Officer's inquiry,

David Tagliabue candidly admitted to Relator that RECON made no effort to supply the

Government with the sizes of gravel it specified but instead simply altered and falsified

the data on the materials sheets/delivery notes it provided the Government to make it look

like the proper size and type of gravel was delivered and thereby caused the Government

to pay for non-conforming material. Specifically, in his email to Relator describing the

situation, David Tagliabue wrote:

> Take a look below. I think Dragan is on holiday. I usually give him
> a copy of the rock contracts so that he can fill out the amounts according
> to the contract.
> We need to send this guy the correct sheet with the amounts
> adjusted all we deliver is 0-30 but they don't know that so we just alter the
> material sheet to match their orders we are the ones using the stone so no
> one knows the difference. For example we were supposed to deliver 3 inch
> material so who ever is filling for Dragan at the moment should say we
> delivered x amount of 3 inch this last week and so on even though it is all
> 0-30. You get me?

Exhibit 15.

101.    From January 23 through June 8, 2009, the Government placed ten Delivery

Orders for gravel and issued payments totaling $10,934,155 for the gravel. Most of the

deliveries were for Camp Leatherneck, and therefore were impacted by the fraudulent

recordkeeping that Relator was informed about and has described above. The final

Delivery Order, paid on July 17, 2009, totaled $493,860. In all, the Government placed

{00045031;9}                                        - 32 -

eleven Delivery Orders under Contract Number W91B4L-09-D-0029 that totaled
$11,428,015. The first ten orders were all placed during the time period covered by the
Records obtained by the Relator. Based on the records obtained by the Relator, the
Government paid at least half a million dollars for falsely inflated quantities of gravel that
were never in fact delivered to Camp Leatherneck. Each Transport Form submitted and
signed by the Defendants was false in that it certified a quantity of gravel that had not
actually been delivered. The Defendants used these Transport Forms to track the quantity
of gravel it delivered under each Delivery Order. RECON used these Transport Forms to
support its invoices to the Government seeking payment for the gravel and submitted the
Transport Forms to the Government in conjunction with its invoices. Therefore, each
Transport Form amounted to a fraudulent record material to a false claim. Each invoice
the Defendants submitted for payment certified completion of Delivery Orders based on
falsely inflated total quantities of gravel. In addition, each invoice falsely represented the
type of gravel delivered to the Government. The Government would not have paid for
material that consistently did not meet the specifications of the contract. Therefore, each
invoice amounted to a false or fraudulent claim for payment.

VI.   **DEFENDANTS KNOWINGLY PURCHASED GOODS ORIGINATING IN
      IRAN FOR USE ON GOVERNMENT CONTRACTS AND CONCEALED
      THAT INFORMATION FROM THE GOVERNMENT**

102.   From December 2009 until 2010, RECON and RIK, a corporate affiliate of
RECON, entered into a number of contracts with the RCC for the construction of pre-
engineered buildings at Camp Leatherneck in Afghanistan.

103.    One of its vendors, Danyal Rahim, who operated Danyal Rahim Trading Co.,

based his operations in the Herat Provence of Afghanistan, on the border with Iran.  In

order to procure low-priced materials, Rahim had connections with materials distributors

in Iran.  Therefore, much of the material procured by Rahim had Iranian origins.

104.    Based on knowledge and belief, much of the steel material RECON used to make

pre-engineered buildings at Camp Leatherneck came from Iran.  When the materials

arrived at RECON's Camp Leatherneck/Bastion in Afghanistan it was labeled with its

Iranian origins.

105.    RECON used these Iranian building materials to construct many of the pre-

engineered buildings at Camp Leatherneck in 2009 through 2010.  Of the over 200

buildings constructed, the former General Manager of RECON, Bruce Kallage, estimated

that at least 60% of the structures were constructed using materials from Iran.  See

Exhibit 16.

106.    At one point in early or mid-2010, officers from the Government's Regional

Contracting Center (RCC) discovered the presence of raw materials, typically used in the

construction of pre-engineered buildings, at RECON's camp, labeled with their Iranian

origins.  Government Contracting Officers demanded RECON dismantle any buildings

which contained the offending materials and refrain from using any material procured

from Iran.  RECON's owners Cain and Trascher apologized to the Military, and assured

them RECON had not used Iranian materials in the construction of prefabricated

buildings at Camp Leatherneck.  They further assured the Government that the presence

of Iranian materials had merely been a mistake, and the purchases would not reoccur.

107.     However, RECON did not refrain from purchasing new material from Iran or take down the buildings that had been constructed using Iranian materials.  Instead, RECON began intentionally deceiving the RCC by first delivering its materials to its parallel camp located at Camp Bastion to remove or paint over Iranian labels, and subsequently transferring the materials to the delivery location at Camp Leatherneck.

108.     In another incident, at or around August 2010, RECON was subjected to a routine nighttime raid by the Military Police.  During this search, the MPs sought access to RECON's storage containers.  RECON was able to convince the officers not to search their containers until the next day.  At that time, Deputy Country Manager Austin Birch was instructed to remove any remaining Iranian labels on materials that were stored in its containers.  The morning following the raid, upon leaving her sleeping container, Contract Administrative Specialist ("Contract Specialist") Melina Secerbegovic saw Birch speaking with Director of Logistics, Russell Lee.  In response to an invitation to go to the gym, Birch responded that he was too "worn out."  In addition, his body was covered with a fine yellowish dust.  Secerbegovic later overheard some colleagues discussing the fact that Birch had "a night shift."  Taken together, these circumstances (the comments about removing labels and night shifts and the dust) led Secerbegovic to conclude that Birch had spent the night painting over and scratching off any indications that  the materials in storage had come from Iran.

109.     Later, Secerbegovic overheard a conversation between Country Manager Craig Carmichael and a RECON engineer from Pakistan.  Carmichael was relating a conversation between himself and owner David Cain.  In the conversation, Cain told

Carmichael about the existence of Iranian materials.  Carmichael relayed his response to the engineer, saying "are you [expletive] serious, we have Iranian stuff in our storage?"

110.    Despite the warning from the Military, RECON  continued to enter into contractual relationships with Danyal Rahim to purchase materials it knew originated in Iran.  It was aware, and had been told explicitly by the Government contracting center, that such purchases were forbidden and would not be accepted under the contract.  Nonetheless, in order to keep costs low, RECON continued to purchase goods it knew or had strong reason to believe came from Iran.

111.    RECON submitted invoices for payments for materials it had purchased knowing the materials originated in Iran, and knowing that the government would not pay for the materials if it knew of their Iranian origins.  Every claim for payment made to Fluor or the Government involving materials originating in Iran constituted a false claim for payment.

## VII.    DEFENDANTS VIOLATED SECURITY REGULATIONS BY CONTRACTING WITH VENDORS ON THE TERRORIST WATCH LIST BANNED FROM MILITARY BASES AND PROHIBITED FROM GOVERNMENT CONTRACTING

112.    Under numerous contracts with both Fluor and the Government, RECON was required to purchase significant quantities of materials and equipment.  To procure these materials, RECON had arrangements with various vendors and subcontractors in the region.  As discussed above, one of their subcontractors was Danyal Rahim.  Rahim also was referred to on the Camp as Romeo.

113.    RECON regularly employed Rahim until late 2008.  Near that time, RECON entered into a contract with the NATO organization in charge of Afghanistan operations,

the International Security Assistance Force (ISAF), to construct a runway at an air base in

the Herat region of Afghanistan.  As part of their contract, RECON was required to

provide engineering services and materials, including asphalt.  RECON procured the

asphalt from Rahim.  However, Rahim provided asphalt that did not meet the quality

specifications of the contract.  RECON engineers present on the site completing the

construction had the opportunity to inspect the asphalt, however they did not reject the

goods.

114.    During a routine inspection of the site, ISAF became aware that the asphalt being

used was non-conforming.  ISAF demanded that RECON redo all construction that had

used the substandard material.

115.    RECON, as a result of the rejection of services, refused to pay Rahim for the

asphalt that he provided.  Rahim was barred from RECON's offices at Camp Bastion, and

RECON staff was instructed to exclude him from further contracts.

116.    Rahim believed he was owed money for the contract, and was upset at RECON's

non-payment and exclusion from future contracting opportunities.

117.    Relator was charged with locating other possible vendors in the region to replace

Rahim.  He began communicating with Mirwais Ahmed, with whom he had a

relationship from a previous stay in Afghanistan.

118.    Around early 2009, Ahmed and Rahim encountered one another in a general store

at Camp Bastion.  Relator was also present, but did not hear or understand the contents of

their conversation.  Rahim was aware Ahmed was considering contracting with



Defendants. Rahim and Ahmed engaged in a brief conversation, the contents of which Ahmed later relayed to the Relator.

119. According to Ahmed, Rahim had informed him that RECON was not to be trusted and had wrongfully withheld payment of a significant amount of money. In addition, Rahim stated that due to this non-payment he intended violence against RECON's owner, David Cain, and its Country Manager, Joey Tagliabue. Specifically, Rahim threatened that upon RECON management's upcoming visit to Herat, he was planning on greeting the men with a group of armed guards in order to kidnap and ransom them for payment for his previous work.

120. Relator immediately informed David Tagliabue, the project manager and Joey Tagliabue's brother, of this threat, so he could relay the message to David Cain and Joey Tagliabue. The trip was subsequently cancelled, and Rahim identified as a security risk for the company.

121. For a period of time, Defendants refrained from using Rahim's services. Instead, at least for their operations at Leatherneck/Bastion, RECON relied on vendor Mirwais Ahmed and his company ZQCC to procure much of their needed materials.

122. However, in September or October of 2009, a dispute arose with Ahmed over payment. RECON's owners determined they no longer wanted to remain in business with Ahmed, and became intent on locating another Afghan vendor.

123. At or around November 2009, RECON's owners reinitiated contact with Danyal Rahim. Rahim once again became a primary vendor for RECON's operations at Camp Bastion/Leatherneck.



124.    In November to December 2009, Rahim set up an office on RECON's compound at Camp Bastion. He spent considerable amounts of time in these offices, and had a close working relationship with RECON's owners and then Country Manager Dominic Johnson. Rahim's local Afghan employees were also permitted to remain at the Camp.

125.    At one point in December 2009, Relator discovered Rahim had satellite dishes and computers in his room. The presence of this technology was a violation of camp security directives, which all contractors at the Camp were specifically required to obey. Relator confronted Rahim about owning these forbidden materials. Rahim replied that Johnson had given him permission to possess the materials in question per "Mr. Dom's orders."

126.    In late December 2009, Rahim was discovered with a camera-enabled cell phone when he attempted to reenter the camp. Consistent with the policy of the British military at Camp Bastion, the phone was confiscated by British intelligence officers, and taken for further analysis.

127.    Forensic analysis of the phone revealed a number of disturbing videos that had been viewed by Rahim. One was a copy of a video taken from a Taliban member's cell phone of an ambush on Highway A1A, a road in Afghanistan, including close-up images of the murder of drivers.

128.    Other videos on the phone included public executions (beheadings) perpetrated by members of the Taliban taken with cell phone video cameras. Rahim also had copies of other disturbing videos, including a public hanging of a woman and two men.

129.    Most disturbing from the Military perspective was a video showing a Vehicle

Born Improvised Explosive Device (IED) being assembled in the back of a Toyota Land

Cruiser by Taliban forces.  The video went on to show members of the Taliban talking to

a young boy, apparently around 17 years-old.  These men were shown hugging the young

man and sending him off in the SUV equipped with the IED.  As the Taliban continues to

film, the young man proceeds to drive up to a Military Convoy and detonate the bomb,

killing himself.

130.    Although Relator was located in Dubai at the time the British Military

apprehended Rahim's phone, Relator's subordinate, George Watton, was present at Camp

Bastion and reported on the situation via email.

131.    Upon first becoming aware of this situation from Watton, Relator emailed the

owners of the company about the incident and its potential consequences.

> Dave and Ken.
> I was told two days ago about a security violation committed by Rahim
> but was not given any information as to what it was exactly until tonight.
> Rahim came through the main gate with a cell phone with a camera inside.
> The FP confiscated it. The Counter Intel Det. went through the phone
> forensically
> They are having Rahim come to an interrogation tomorrow at their area.
> George will be present for the interrogation to obtain all information. The
> information given to me tonight says that Rahim will more than likely be
> barred from Bastion and all ISAF military installations due to the nature of
> the information discovered on his phone. There are other LNs who work
> for RECON who will probably be barred from Bastion and all ISAF
> installations directly related to this incident as well. I will advise you
> tomorrow the update as soon as Rahim is interviewed.
> If he is barred physically and barred from doing business on the
> installations could cause us a 'disruption in continuity of business' I will
> let you know as soon as I receive a report"

A copy of the email chain is attached hereto as Exhibit 17 and incorporated herein.

132.   RECON owner Kenneth Trascher responded

> Hi Tim,
> Rahim is central to our operation and way forward. We must petition for
> warning/exception. He is a businessman educated in the US and not the
> typical Afghan.
> Get you senior guy on it and do not neglect.

133.   After determining the details of the videos that were found on the phone, Relator

informed the owners of their contents in detail.  In addition, Relator noted:

> These Videos regardless of their origin have the UK Military Counter
> Intel/Sys Det pretty upset. I was told that my relationship with the military
> is a non-issue in their decision making process in this matter. The
> Interview with Rahim will be conducted shortly and they said that the
> outcome looks at this point 0900 hours the 27th of Dec 09 that He will be
> barred based on the videos he has on his phone.

Exh. 17.

134.   In response, owner Kenneth Trascher wrote "Wow! Dave, seems like we need to

contact the brother."

135.   Trascher was referring to contacting Rahim's brother, who operated the business

together with Rahim.  Rather than terminate ties with a vendor who presented an obvious

security risk, Trascher was more concerned with preserving the continuity of business

operations.

136.   The British security forces extended their inquiry into Rahim and engaged in a

search of his quarters.  At the time, Rahim again was taken in for questioning by the

British forces operating the base at Camp Bastion.

137.   During the search, the officers discovered numerous laptops and photo-enabled

cell phones in Rahim's and his employees' quarters.  Many of these electronics also had

suspect materials on them. In addition, during the interrogation by British forces, Rahim was hostile and uncooperative.

138.    As a result of these findings, the Military made the decision to add Rahim to the "Terrorist Watch List" and thereby bar the contractor from all US, UK, ISAF and NATO military institutions worldwide. Under the terms of this prohibition, all business with Rahim, either through him, his agents, or family, was strictly prohibited.

139.    Rahim was released to the RECON camp, and prohibited from leaving for a period of time while the investigation continued. The British Military returned a cell phone to Rahim, in the hopes of tracking calls and text messages to uncover additional evidence or terror suspects. During this time period, British military forces informed Watton of their intent to add Rahim to the list of prohibited vendors.

140.    Based on information from Watton, Relator informed RECON owner Kenneth Trascher at or around late December 2009 or early January 2010 that RECON had been told by the British forces that doing business with Rahim was not simply a "RECON security issue," that it was a military security issue. Relator understood this to mean contracting with Rahim would not be an option in the future, and conveyed this to RECON's owners. He also told the owners that the Military had informed Watton if they did not intend to comply, or if they attempted to warn Rahim, RECON could "pack their things and go." Trascher became enraged by this comment.

141.    In spite of that specific admonition, RECON owner David Cain sent a text message to Rahim warning him of the pending ban. Shortly thereafter, Rahim was expelled from the Camp, and his name was included among those who were prohibited

from doing business with or entering any US, UK, ISAF, or NATO military facility worldwide.

142.    News of Rahim's ban was circulated to the owners of RECON, and all contractors doing business in the region. RECON's owners specifically knew that the prohibition extended to parties acting on behalf of Rahim.

143.    However, rather than risk a disruption in business, RECON's owners continued to contract with Rahim through his brother Haji Jamil and cousin Homayoun. Throughout 2010, RECON routinely engaged Danyal Rahim's business, now operating under the front of his family's name, in order to procure goods for its various government contracts.

144.    RECON knowingly and intentionally violated an explicit security directive in order to maintain business continuity and the low prices they had arranged with Rahim. Security violation such as these could result in debarment, suspension, and lack of contract renewal.

145.    In international military operations, security is the highest priority to the Government. It is essential contractors do not endanger military operations through intentional violations of security regulations.

146.    In entering into contracts with the Government, RECON fraudulently affirmed their intent to comply with applicable laws and regulations while knowing they were going to continue to do business with a vendor who had been explicitly barred from doing business with the Military because of national security concerns. On information and belief, most, if not all, of the contracts for operations at Camp Bastion or Camp

Leatherneck from the period of November 2009 through December 2010 involved contact with and materials procured by Rahim.

147.    Further, had the Government known that the materials used in the construction of various camps across the Afghanistan region came from a suspected terrorist, it would not have paid out claims. All claims for payments based on goods RECON procured through Rahim or his family members after Rahim was banned were therefore fraudulent.

## VIII.  DEFENDANTS CAUSED FLUOR TO SUBMIT FALSE CLAIMS FOR PAYMENT TO THE GOVERNMENT

148.    From 2008 through 2010, RECON had over 1,000 employees working on more than fifty different projects at over a dozen different sites in Afghanistan under the LOGCAP IV subcontract. RECON, from the initiation of its operations in Afghanistan, failed to hire individuals qualified to track contract operations and maintain the type of documentation necessary to enable operations of this magnitude. Rather than hire United States nationals with experience in government contracting, RECON would hire Indian, Philippine, or Bosnian workers with little to no experience in contracting operations, and no prior experience with United States Government contracts. These employees were never properly trained in Government contracting, and were not able to ensure RECON met its contractual requirements. RECON's failure to institute a workforce capable of maintaining basic records ensured RECON would not be able to accurately bill Fluor, who in turn billed the Government, for the work RECON completed.

149.    From the period of September 2008 until October 2009, RECON did not have staff in place to maintain databases and other records required for basic, proper contract management. RECON routinely failed to comply with basic contract requirements,

including performance specifications, such as acquiring the proper amount of equipment

or hiring qualified personnel, and documentation requirements, such as tracking costs

through the maintenance of accurate invoices and supporting data.  Because of its

reckless disregard of the need to implement basic tracking systems for government

contracts (such as the LOGCAP IV contract), RECON was unable to perform basic

contract tasks, such as the finalization of price terms based on demonstrated costs.

150.    RECON's indifference to the need to document and account for its expenditures

and work on the LOGCAP IV contracts continued until Fluor threatened, and eventually

performed, an audit of RECON's performance, which began in October 2009. Until that

date, RECON had failed to provide basic documentation required by the two Labor-Hour

Task Order Releases (002 and 004) and two construction Task Order Releases (001 and

003).  Only when it was faced with the Fluor audit (and the prospect of being forced to

repay Fluor for its overbilling) did RECON see fit to hire three employees with some

experience in Government contracting.  While these RECON employees (Joseph

"Danny" Rider, John Galloway, and Jeffrey Mallory) had some Government contracting

experience, RECON's failure to implement appropriate accounting and tracking systems

left them with little to no accurate or contemporaneous records with which to reconstruct

and support RECON's prior work under the four Task Order Releases.

151.    The lack of trained employees, and in turn, software and databases, capable of

tracking, recording, and reporting their performance under the LOGCAP IV subcontracts

led to the creation and submission of false or fraudulent records in three distinct ways.

a. **Double billing for specific missions.** RECON failed to track, and then submitted false information, regarding the MEB mission. RECON submitted false and/or unverified documentation regarding the number of employees working on the project, the availability of labor and equipment for the project, and the duration of the project. RECON then billed the Government multiple times for the same manpower and equipment.

b. **Tracking labor hours and projects.** As described *supra* ¶¶ 59-65, RECON was required to create and submit time sheets accurately reporting the time employees worked and the projects on which they worked under TOR 002 and 004, RECON's Labor-Hour contracts with Fluor. The number of hours reported was the direct basis for RECON's payment under these contracts. In addition, for TORs 001 and 003, RECON was required to document for auditing purposes both the hours worked by employees and the projects on which they worked. This information was used to support RECON's costs under the contract, used as the basis of fixing a final price, and to verify full performance of the contract. RECON routinely directed employees to falsify records involving employee time and projects. Even after Fluor's audit exposed these deficiencies, RECON did not implement a system to accurately track either employee time or project work.

c. **Tracking and reporting other costs.** In addition to tracking labor, RECON was required to maintain records to verify costs of materials, equipment, and transportation, in order to support its payments from Fluor under its LOGCAP

IV subcontracts for the work RECON completed.   RECON did not accurately track its costs contemporaneously with the performance of the work, but instead amended its records after the fact—with no reliable information—to submit cost information to Fluor during the course of an audit to ensure it got paid.

152.   In these three ways, as further described below, RECON used false documentation to support claims for payment to Fluor, which, in turn, was getting reimbursed by the Government. Through the fabrication and use of these artificial records, RECON inflated its costs and ultimately its profits.  In so doing, RECON was able to conceal from both Fluor and the Government  (1) the true amount of time worked by RECON's employees and (2) the amount spent on any of the contracts completed by RECON, even those that were eventually paid based on provable costs.  RECON used false records to "prove" its costs.

### A. Defendants Used On Multiple Contracts Equipment And Labor Exclusively Designated for One Contract And Falsely Certified That Such Labor and Equipment Was Available For Exclusive Use 24 Hours A Day, 7 Days A Week

153.   On March 13, 2009, RECON entered into Contract Modification Number 008 under Task Order Release 003 to provide "additional equipment and operators, (2 cranes, 4 fork-lifts, and 15 tractor/trailer flat bed trucks), required for the loading, movement and unloading of material and equipment from point of arrival to construction site at Camp Bastion and FOB Tombstone for the Marine Expeditionary Battalion (MEB)." Within RECON, this project was known as "the MEB mission."  A copy of the contract modification is attached hereto as Exhibit 18 and incorporated herein. The MEB contract

was established as a Limited Notice to Proceed with a Not-to-Exceed value of $450,000. Per the modification, RECON was required to provide Fluor a detailed fixed-unit rate proposal for the equipment as well as operators "to perform the off-loading transportation operations on a 24 hours / 7 days a week basis for the full period of performance, 3/15/09 through 8/15/09." Exh. 18.

154.    In an April 6, 2009 email to RECON Contract Administrator Charles Priest prompting him to provide RECON's rate proposal, Fluor reminded RECON that the off-loading equipment was for the exclusive use of the MEB and should not be "part of the FLE material handling equipment." A copy of the email chain, which includes RECON's rate proposal, is attached hereto as Exhibit 19 and incorporated herein. The Forward Logistic Elements (FLE) Contract was a separate contract between Fluor and RECON that also required the use of heavy construction equipment. In direct response to this email, RECON submitted its rate proposal to Fluor on April 16, 2009. Exh. 19.

155.    The MEB mission involved the off-loading of cargo from military flights arriving at the British Camp Bastion, and then relocating those materials to the U.S. Military Camp Leatherneck. Because there was limited storage space for inbound materials at Camp Bastion, immediate transportation of the materials to a secure location at Leatherneck was necessary to prevent theft. It was because of this need to immediately unload materials that the equipment and labor was required to be available 24 hours a day, 7 days a week.

156.    RECON rented its equipment for the MEB mission from ZQCC, the same vendor who supplied RECON with trucks to transport the river rock. RECON procured two

{00045031; 9}                                  - 48 -

cranes and 16 trucks from ZQCC to complete the MEB mission. The local laborers would drive their own trucks for the mission. RECON paid ZQCC $3,200 per month for the trucks, and $9,000 per month for cranes. RECON could not obtain the forklifts. Costs for mobilizing and demobilizing the equipment as well as labor costs for the operators/drivers were included in the flat rate. Costs for housing and feeding the laborers at Camp Bastion were additional.

157. Upon the arrival of a flight into Bastion in need of unloading, the Military Air Travel [MilAir] Logistics Officer would contact RECON or call Fahrudin Nuhic, RECON's supervisor for the MEB mission, to direct him to immediately commence work unloading and transporting materials from Bastion to Leatherneck. Since the labor and equipment was supposed to be reserved exclusively for use on the MEB contract, deployment and unloading was expected to be immediate and swift. However, because RECON routinely used the MEB labor and equipment on other contracts and thereby was able to bill the government twice for these costs, RECON often was unable to perform its unloading duties and either the work fell to the U.S. Military personnel or the cargo was left unprotected and delivered to Leatherneck late.

158. During March through August 2009, the period of performance of the MEB contract, Relator was working at Camp Bastion/Leatherneck and regularly observed RECON using on other projects, including the Local Haul contract, transporting T-Walls contract, and other non-LOGCAP operations, the equipment and labor that was supposed to be dedicated exclusively to the MEB mission. Relator also had a close working relationship with Fahrudin Nuhic, RECON's supervisor for the MEB mission, and

Mirwais Ahmed, who ran ZQCC, the vendor supplying the equipment and local labor for

the MEB mission.  Both men were aware of RECON's use of the same MEB labor and

equipment on multiple contracts, and discussed these abuses with Relator.

159.    Specifically, project supervisor Nuhic complained to Relator that RECON was

requiring his team, which was hired exclusively for the MEB contract, to work on other

projects under the LOGCAP IV and other contracts RECON had around Camps

Leatherneck and Bastion, including the Local Haul contract (a project to provide local

transportation and material handling support on Forward Operating Bases in southern

Afghanistan).  In addition, Relator observed that RECON regularly was using on multiple

projects the equipment that was supposed to be dedicated exclusively to the MEB

mission.  As RECON's LOGCAP IV Project Manager Rod Ward pointed out in an email

dated July 16, 2009, the type of shared use of MEB equipment and labor on multiple

projects that Relator observed was improper because it resulted in double billing the

Government.  Exhibit 20.  RECON routinely required the MEB laborers, in addition to

supervisor Nuhic, to work twenty or more hours a day.  Despite clear contractual

requirements, many of these hours were  spent working on projects outside the MEB

contract, including the Local Haul contract. On at least three occasions, Relator notified

RECON's senior management of the improper use of the MEB equipment and labor

outside the MEB project with little to no effect.

160.    In a July 16, 2009 email to LOGCAP IV Project Manager Rod Ward, on which

RECON owner Ken Trascher was copied, in an effort to keep RECON from firing certain

of the higher-cost Bosnian MEB laborers, Relator recounted in detail all the work that

these MEB workers had done on non-MEB contracts, including the Local Haul contract,

T-barriers project and other construction contracts at Leatherneck:

> The Afghan Truck drivers that operate the 17 trucks for MEB have to be
> escorted from the Flight line to Leatherneck and when they do local haul
> and MEB missions the trucks break up in teams of three or four and
> require one of our Bosnians to be with that team.
>
> The Bosnians on that team work on call 24/7 at the flight line for the
> MEB mission, they work days unloading T Barriers at leatherneck and
> fulfill all requirements of the Local Haul as well. These men also are
> tasked as needed by Nermin at Leatherneck for the use of the cranes and
> trucks to assist in his construction efforts at Leatherneck.

Exh. 20.    Relator also told Ward and Trascher that these practices had been going on

since since at least March 2009.

161.    On July 17, 2009, as part of this same email chain, Relator again noted to RECON

Project Manager Rod Ward that the MEB laborers were working on multiple projects

outside the MEB contract, explaining that "the same men work during the day at [Camp

Leatherneck] unloading t-walls are the same men working the MEB mission." Exh. 20.

RECON owner Ken Trascher and other senior RECON employees were copied on this

email.

162.    In his email response, Ward acknowledged the problems created by the

extracurricular use of MEB's equipment, stating "the equipment for the MEB MUST be

different than that for the Local Haul. This is NOT an option because we are getting paid

for both missions separately. If this is not the case, then Nermin, you need to let

[RECON Contracts Manager] Charles [Priest] know so he can get more equipment there

to handle the local haul mission." Acknowledging RECON's failure, he went on to note

"We desperately need to put up more tents and get more equipment. We are being paid

{00045031; 9}

1st AM. COMPLAINT

fairly to provide these services. We need to keep them segregated for accountability and audit ability purposes."

163.    However, despite Ward's directive, Relator observed, and through his relationship with Ahmed, whose company ZQCC was the primary supplier of cranes and trucks to Camp Leatherneck at the time, knew that RECON did not rent additional cranes or trucks to fulfill the Local Haul and additional construction contracts. As was typical for their operations, RECON did not procure more equipment for the other non-MEB contracts but continued instead to use the MEB equipment on multiple contracts to double its government payments for the same equipment and avoid outlaying additional costs.

164.    In an email dated May 7, 2009, Relator also informed RECON's Project Manager and Country Manager, Joey and David Tagliabue that the MEB laborers were working grueling hours in order to support both the MEB and Local Haul missions:

> We have some 40 workers working for the MEB Project some of them are putting in 24 hour and 23 hour days. They are keeping a record of all the hours they put in "overtime" and are anticipating being paid accordingly for their extra efforts.

Exh. 21.

165.    In their roles as Project Manager and Country Manager, David and Joey Tagliabue oversaw the procurement of the equipment and labor for the MEB and Local Haul missions and knew that the MEB labor and equipment were being used for multiple jobs in violation of the requirements of the contract modification with Fluor. During that time, owners Dave Cain and Kenneth Trascher were also frequently "in-country" residing at Camp Bastion/Leatherneck. The owners oversaw daily operations at the camp and communicated with the Tagliabues about projects and equipment.

166.    In addition to being well-known within RECON, the fact that RECON was using the MEB equipment on non-MEB contracts was observed by a Fluor employee as well. At one point during RECON's performance of the MEB contract, Fluor representative John Vererka remarked to Relator upon seeing that RECON was using the MEB equipment on the Local Haul contract, "Don't tell me that's the MEB equipment being used on the Local Haul project." Relator, unsure of the equipment's use, declined to answer. The dual-use of MEB equipment regularly slowed down LOGCAP construction operations.

167.    At times, due to the fact that it was using the MEB equipment and labor on other projects, RECON was unable to unload MEB cargo when needed, and the U.S. Air Force or U.S. Marine Cargo personnel were forced to do the unloading work with its own equipment to ensure the plane was off-loaded and redeployed in a reasonable amount of time. As a result, materials were left on the tarmac for extended periods of time. This delayed operations at the airfield, as the military could not unload additional flights while equipment was occupying the tarmac, and exposed the equipment to risk of damage or theft. Furthermore, because Camp Bastion had limited secure storage space, materials left at the Camp for extended periods were at risk of theft. RECON was unconcerned with these risks and the burden placed on Government in its pursuit of cost-cutting measures.

168.    Although it was aware of these deficiencies, RECON was unwilling to increase its costs by renting the additional equipment and hiring the additional labor necessary to have one set dedicated exclusively to the MEB project and another set available to fulfill its remaining contractual obligations. RECON continued to use the MEB equipment and

labor on multiple projects throughout the six-month performance period for the MEB contract from March through August 2009 and invoiced the government for work that it knew violated the LOGCAP IV requirements.

169.    Overall, the MEB equipment was only available for the MEB mission for approximately half the time required, because RECON used the equipment and labor for other projects.

170.    RECON and Fluor did not negotiate a final price prior to completion of the contract. Nevertheless, RECON invoiced against its proposed cost for the months of March through June, 2009. Although these invoices were not paid because the contract was not finalized and RECON was later forced to revise and replace them with a new invoice in the course of Fluor's subsequent audit of RECON, they are nonetheless false because RECON submitted them knowing that they had violated the exclusivity provisions of the Fluor contract modification.

171.    After performance of the MEB mission was completed in August 2009, a final price still had not been determined for the MEB contract. RECON had submitted a proposal, but Fluor had not accepted it. Richard Sober, an employee of Fluor who was responsible for auditing RECON's costs and closing out the contract, submitted a settlement offer for the MEB contract on November 10, 2009. Sober proposed using the equipment rates from RECON's proposal ($11,902.50 for cranes, $4,628.75 for trucks) that included labor and maintenance, while paying $30 per person per day for housing and $30 per person per day for food for the labor. He also agreed to pay $6,083.50 for mobilization and demobilization of each piece of equipment. In his email, Sober

included necessary adjustments of previous invoices to correlate to these values. In addition he proposed paying the same rate for July and August, "dependent upon the period of performance that this service was performed. **NEED TO VERIFY ACTUAL COMPLETION DATE.**" (Emphasis in original). The total proposed settlement was $866,743 for performance of the services under the contract. A copy of the email chain is attached hereto as Exhibit 22 and incorporated herein.

172.   RECON revised its previous invoices under the MEB contract and replaced them with Invoice 5961. However, Fluor would not process the invoice for payment until RECON supplied supporting documentation.

173.   RECON then began the process of collecting supporting documentation for the MEB contract. However, consistent with RECON's shoddy record-keeping in other areas of its business (including time keeping and definitization of Task Order Releases 001 and 003), RECON lacked supporting documentation or any way to verify the proper performance of the MEB contract.

174.   In a series of emails, RECON employees attempted to get verification for labor, equipment rentals, and period of performance. RECON compiled a limited list of invoices of equipment, and procured an affidavit from the subcontractor ZQCC that his employees were paid. This affidavit was in place of supporting documentation such as time sheets and payment records, which RECON did not maintain. The Relator believes, based on conversations with Mirwais Ahmed, the owner and President of ZQCC, that the employees were not in fact paid for the amount of time they worked on the multiple contracts. Instead, the Relator believes Ahmed was forced to sign the affidavits under

{00045031; 9}